Robert M. Douglas *et al. v.* The Union Mutual Life Ins. Co.

and

Adele Cutts Williams *et al. v.* The University of Chicago.

*Filed at Ottawa January 25, 1889.*

1. Contract—*construction—supplemental agreement.* Where a written agreement is changed, in some respects, by a further agreement, which recites that all the other conditions and provisions in the first shall remain, in all respects, as therein stated, except as changed and amended by the last agreement, the two agreements must be read as if what is changed by the last were stricken out of the first, and the matter of the last agreement were substituted.

2. Same—*contract to convey land—restrictions therein obviated by the character of the deed—merger of the preliminary contract in the deed.* One who gives his obligation to convey land as a site for an educational institution when certain conditions shall be performed, the title to be inalienable, and to forever remain in the institution, may waive the performance of the conditions precedent, and convey the land in fee simple absolute, free of any and all restrictions, so that the grantee can sell or incumber the same.

3. The owner of land gave his obligation to one in trust, whereby he agreed, upon certain conditions, to execute and deliver to the board of trustees of a proposed university, or their successors in office, a good and sufficient deed of conveyance of a tract of land described, "for the sole and exclusive use of the university, inalienable for any other use or purpose forever." The board of trustees never performed the conditions prescribed in the contract, and were never entitled to a deed for the land, but the maker of the agreement to convey, of his own accord made a warranty deed of the tract, free of any restriction on the power of alienation : *Held,* that the title thereby passed to the grantee, and that the university might mortgage the same, and the title would pass on foreclosure and sale, free from any rights of the grantor's heirs and widow.

4. In such case, the grantee has no right to insist that the deed be read as being qualified by the previous agreement, because not having performed its conditions, no rights could be properly claimed under it, and the deed being a voluntary grant, contained its own limitations, and therefore the grantee, in accepting it, accepted it as it was.

5. It is a general rule, that a written agreement for the execution of a deed is merged in the deed, when made and delivered. So a covenant to convey a parcel of land for a designated purpose, making the

premises not subject to alienation or incumbrance, is satisfied by a deed in fee, without any restrictions on the power of alienation.

6.   CHANCERY—*forfeiture—breach of condition subsequent.* A court of equity will not lend its aid to enforce a forfeiture because of a breach of a condition subsequent,—not even upon the special ground of re-moving a cloud on title.

7.   CORPORATION— *charter limiting power of alienation—construed.* A clause in a charter of a university, that "no gifts, grants or devises made to the university for a particular purpose shall be applied to any other purpose," has reference only to donations in aid of the accomplishment of a special object, as distinguished from aid to the university generally. It does not prohibit the alienation of land conveyed to it by a general deed expressing no specific purposes of the grant.

APPEAL from the Superior Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

The following instrument was executed by the parties thereto at the date therein stated:

"This agreement, made this second day of April, in the year of our Lord one thousand eight hundred and fifty-six, between Stephen A. Douglas, of the county of Cook and State of Illinois, of the first part, and John C. Burroughs, of the city of Chicago, of the second part:

"*Witnesseth,* that the said party of the first part, in consideration of the covenants and agreements hereinafter contained, and of the sum of one dollar in hand paid by the party of the second part, the receipt of which is hereby acknowledged, agrees and binds himself, his heirs, executors, administrators and assigns, to donate and grant unto the said party of the second part, all that certain piece or parcel of land situate, lying and being near the southern boundary of the present city of Chicago, Illinois, and being a part of the south half of the north-east quarter of section thirty-four (34), of township thirty-nine (39), of range fourteen (14), east, and bounded as follows:   On the east by street or avenue known as 'Cottage Grove avenue,' on the north and south by two parallel lines, commencing on Cottage Grove avenue at points immediately

opposite two parks, described on map made by J. E. Boyd in July, 1855, as Groveland Park and Woodland Park, at a distance of fifty feet, respectively, from the north line of Groveland Park and from the south line of Woodland Park, running west to a north and south line, at such distance from the center of Cottage Grove avenue as that within the four lines thus described there shall be embraced ten acres of ground, inclusive of a space thirty-three feet in width on each of the four sides of said plat, to be set apart, along with an equal quantity of the adjacent ground, for the purpose of a sixty-six feet street on all sides of said tract.

"The condition of this agreement is such, that if the said John C. Burroughs, party of the second part, shall fail, within a reasonable time, to procure the organization of a board of trustees of a university, according to the statutes of the State of Illinois, to consist of the following persons, viz.: Stephen A. Douglas, Hiram A. Tucker, William B. Ogden, John H. Kinzie, Charles Walker, E. D. Taylor, Samuel Hoard, James H. Woodworth, Levi I. Boone, Walter S. Gurnee, Mason Brayman, Rev. Mr. Clarkson and John C. Burroughs, residents of the city of Chicago; and James Dunlap, of Jacksonville, Illinois; Elijah Gove, of Quincy, Illinois; Charles H. Roe, of Belvidere, Illinois; Henry G. Weston, of Peoria, Illinois; Simon G. Miner, of Canton, Illinois; and N. W. Miner, of Springfield, Illinois, and such other persons as they may appoint, to which trustees this agreement shall be assigned, and which board of trustees shall procure the plans for a building such as shall be mutually agreed upon by them and the party of the first part aforesaid, all differences to be referred to the decision of Thomas U. Walters, architect of the National Capitol at Washington, D. C.,—said building to be erected on the premises hereinbefore described, and to cost not less than $100,000, to be expended as follows: $25,000 within one year from the first day of May next, (provided the foundation shall be completed within the present year,) and the further sum of $25,000

within two years from the first day of May next, and the further sum of $50,000 within or prior to the expiration of the year one thousand eight hundred and sixty,—then, in case of the failure of the said party of the second part to perform the conditions above named, or any part of them, this agreement shall be null and void, otherwise it shall remain in full force and virtue; and then, on the completion of the building, as aforesaid, the said party of the first part agrees, for himself, his heirs, administrators, executors and assigns, that he will execute and deliver to the board of trustees aforesaid, or their successors in office, for the purposes of the university hereinbefore mentioned, a good and sufficient deed of conveyance, assuring to said board of trustees, or their successors in office, the fee simple of the premises above described, free from incumbrance. And the said party of the first part further agrees to give to the party of the second part immediate possession of the before mentioned premises.

"In witness whereof, the said parties of the above agreement hereunto set their hands and seals, the day and year above written.                              S. A. Douglas,    (Seal.)

J. C. Burroughs. (Seal.)

"Signed in the presence of Nicholas Vedder and Charles D. Selden."

The instrument was acknowledged at Washington, D. C., before Charles D. Selden, commissioner for Illinois.

A majority of the persons named in this instrument, on the 6th of July, 1856, effected a temporary organization as a board of trustees of the university, and accepted the grant.    Contributions to the university were made by various parties, but by November 10, 1856, it was ascertained that the stipulations in the agreement in regard to the laying of the foundation of the building and making the first expenditures thereon, could not be complied with, and thereupon, on that day, the following instrument was executed:

"I, Stephen A. Douglas, party of the first part to the foregoing agreement, do hereby extend the time for laying the

foundation of the university until the first day of May, and for expending the first sum of twenty-five thousand dollars ($25,000) until the first day of October, 1857, all the other conditions remaining, in all respects, as stated in said agreement. This extension of time is granted on the condition and with the understanding that the title of said land shall forever remain in said university, for the purposes expressed in said agreement, and that no part of the same shall ever be sold or alienated or used for any other purpose whatever.

"Chicago, *November 10, 1856.*                 S. A. Douglas."

This was accepted by Burroughs.

On the 20th of January, 1857, a special act of the General Assembly, incorporating the Chicago University, was approved by the Governor. The trustees named in the temporary organization and in the agreement were made trustees in this act. By the act, usual and ample powers for the objects of the corporation were conferred. So far as their consideration may be material, they will be set out in the opinion.

On the 21st of May, 1857, the board of trustees named in the charter, met, and effected an organization, making Douglas chairman, and accepted the charter. At this meeting it was also "Resolved, that in accepting the grant of the Hon. S. A. Douglas, the trustees record their high appreciation of his munificence, and their cordial interest in carrying out the noble object which it contemplates." At the same time, "plans for a college building presented by Boyington & Wheelock," were adopted, and the executive committee was directed to place the center of the main building in the center of the grounds donated by Douglas, etc.

On the 27th of May, 1857, Burroughs formally assigned the agreement between Douglas and himself, to the Chicago University, and on the 4th day of July of that year the corner stone of the university building was laid with imposing ceremonies, the building being located in the center of the ground

donated by Douglas. On the 8th of September, 1857, Douglas, in consequence of charges made by his political enemies, to the effect that his donation was for the purpose of speculation, proposed to the trustees of the university, that he would, in lieu of the lands donated, refund all the moneys expended thereon, including the cost of laying the corner stone, and in addition pay $50,000 toward establishing the university, upon the plan which had been adopted, on any other site which the board of trustees might select,—the $50,000 to be expended in endowing a school of law in the university; but the board of trustees declined to accept the proposition.

Work upon the building progressed slowly. At a meeting of the board of trustees held on the 14th of July, 1858, a report from the executive committee was received, explaining why work on the university buildings had thus far been suspended, and strongly urging that measures be now taken to so complete the proposed building as would afford accommodations for opening the university in the fall; and the trustees then adopted the recommendations of the executive committee, and instructed the committee to contract with builders for the erection of the south "wing" and corridor, on the best terms practicable.

Before work on the building had greatly advanced, on the 13th of August, 1858, Douglas and his wife, Adele, (who is the Adele Cutts Williams in the present suit,) executed a deed to the university, which, however, was not acknowledged until the 30th of that month, and recorded on the 13th of the next month, as follows:

"This indenture, made this 13th day of August, in the year of our Lord one thousand eight hundred and fifty-eight, between Stephen A. Douglas, of the city of Chicago and State of Illinois, and Adele Douglas, his wife, parties of the first part, and the Board of Trustees of the 'University of Chicago,' party of the second part:

"*Witness,* that said party of the first part, for and in consideration of the sum of one dollar to him in hand paid by said party of the second part, the receipt whereof is hereby acknowledged, hath granted, bargained and sold, and by these presents doth grant, bargain and sell, unto the said party of the second part, and their successors and assigns, all the following described lot, piece or parcel of land, situated in the county of Cook and State of Illinois, to-wit:

"That part of the south half of the north-east quarter of section thirty-four (34), in township thirty-nine (39), north, of range fourteen (14), bounded and described as follows: Beginning at a point in the center of Cottage Grove avenue fifty (50) feet due south of the south line of lots in Oakenwald subdivision lying next north of Groveland Park, running thence west parallel with said south line of lots, and fifty (50) feet from said line if extended a distance of six hundred and twenty-seven (627) feet; thence due south a distance of six hundred and fifteen (615) feet; thence east on a line parallel to and fifty (50) feet north of the north line of the lots in said Oakenwald subdivision lying next south of Woodland Park, a distance of seven hundred and ninety (790) feet, to the center of Cottage Grove avenue; thence northwesterly on the center line of said avenue, six hundred and thirty-six (636) feet, to the place of beginning, containing ten (10) acres. A strip of land thirty-three (33) feet wide around the entire tract of land above conveyed, to constitute and form the one-half of a street to be hereafter laid out around said tract, sixty-six feet in width, the other half of said street so to be opened to be dedicated for that purpose by said party of the first part.

"Together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever, of the said party of the first part, either in law or equity, of, in and to the above

bargained premises, with the hereditaments and appurtenances; to have and to hold the said premises above bargained and described, with the appurtenances, unto the said party of the second part, their successors and assigns, forever.

"And the said Stephen A. Douglas, party of the first part, for himself and his heirs, executors and administrators, doth covenant, grant, bargain and agree, to and with the said party of the second part, their successors and assigns, that at the time of the ensealing and delivery of these presents he is well seized of the premises above conveyed, as of a good, sure, perfect, absolute and indefeasible estate of inheritance in the law, in fee simple, and hath good right, full power and lawful authority to grant, bargain, sell and convey the same in manner and form aforesaid, and that the same are free and clear from all former and other grants, bargains, sales, liens, taxes, assessments and incumbrances, of what kind or nature soever, and the above bargained premises in the quiet and peaceable possession of the said party of the second part, their successors and assigns, against all and every person lawfully claiming or to claim the whole or.any part thereof, the said party of the first part shall and will warrant and forever defend.

"In witness whereof, the said parties of the first part hereunto set their hands and seals, the day and year first above written.

S. A. Douglas,   (Seal.)
Adele Douglas. (Seal.)"

It was acknowledged in proper form, before a justice of the peace of Cook county.

The record of the board of trustees shows a meeting on the 7th of September, 1858, and that at such meeting Dr. L. D. Boone made a statement with regard to arrangements made by the executive committee for issuing bonds for a loan, based upon the deed of ground by Douglas to the university, and a resolution was then adopted, "that the university grounds, and the buildings to be located thereon, be mortgaged, or con-

veyed by deed of trust," as therein provided, "as security for a loan or loans of money, not exceeding the sum of $25,000," etc., and the president or vice-president, and secretary, were authorized to execute the mortgage. A committee was appointed to negotiate sale of the bonds, and the following other resolution was adopted:

"*Resolved*, That in order to place the security of our loan beyond question, the members of the board and other friends of the university be requested to guarantee the payment of the bonds and coupons above authorized, and that the financial agent of the university be directed to place in the hands of William Jones, Esq., $30,000 of its bills receivable, to indemnify said guarantors against loss upon said guaranty."

The board then adjourned until the next day, and at its meeting on the next day the following additional resolutions were adopted:

"*Resolved*, That the thanks of this board be presented to Hon. S. A. Douglas for his liberality in waiving the terms of the original contract for the conveyance of the university grounds, and giving us a deed of the lands donated by him for the university.

"*Resolved*, That the executive committee of the board be authorized to execute a bond to Judge Douglas, as shall be satisfactory to him and approved by the said executive committee, for the faithful carrying out of the university enterprise according to the spirit of the original contract."

In pursuance of this authority, twenty-five bonds, for the sum of $1000 each, dated September 1, 1858, payable in five years from date, were issued, and their payment was secured by deed of trust on the ground conveyed by Douglas to the university, to Mark Skinner, trustee. This deed, and the record of it, were destroyed by the great fire in Chicago, in October, 1871, but the proof is clear that it was executed by Douglas, as president of the board of trustees of the university. The bonds seem to have been sold upon the market, and a

portion of them were purchased by the Union Mutual Life Insurance Company. Soon after their issue, and by the 1st of April, 1861, that company had become the owner and holder of the entire issue. An extension of time for the payment of the bonds was agreed upon between the university and the insurance company, and in September, 1861, a new trust deed was executed by those then representing the university, to Levi D. Boone, as trustee, to secure the payment. Thereafter, additional loans were obtained by the university from the insurance company, from time to time, and secured by trust deeds upon the same property, to the same trustee. The university failed to pay either principal or interest, and finally, on the 8th of February, 1876, it obtained a further loan of $13,143.84, which, added to principal and interest then due on prior loans, made $150,000 the university owed the insurance company, and, to secure this, the university then executed its deed of trust on the same property included in the prior deeds of trust, to Levi D. Boone, as trustee. All of the loans were obtained for the purposes of finishing the buildings or paying other expenses properly incurred by the university, and the consent of the requisite number of trustees, as required by the charter, was given prior to obtaining the several loans. Default having been made in payment of the $150,000 and accruing interest, a decree of foreclosure of the deed of trust was rendered by the Circuit Court of the United States for the Northern District of Illinois. The property was sold pursuant to the decree, and bought by the insurance company. There being no redemption, the master conveyed the property to that company, by deed.

On the 8th of May, 1885, Stephen A. Douglas and Robert M. Douglas, heirs-at-law of Stephen A. Douglas, deceased, filed their bill in chancery, in the Superior Court of Cook county, against the University of Chicago, setting up, among other things, the facts heretofore recited, and thereupon claiming that the grant by Douglas to the university was upon the con-

dition subsequent that the property should be forever held by the university for the purposes of the university; that such condition was broken by the making of the trust deed of February 8, 1876, and praying that the premises might be decreed forfeited to them by reason of that breach of condition.

On the 30th of April, 1886, the present bill was filed by Robert M. Douglas, one of the heirs-at-law of Stephen A. Douglas, deceased, and by Adele Cutts Williams, his widow. The same facts, in substance, are alleged in this bill as in that filed by Stephen A. and Robert M. Douglas, *supra.* Stephen A. Douglas and the Union Mutual Life Insurance Company are made defendants. Stephen A. Douglas filed answer and cross-bill, and answer and cross-bill were also filed by the insurance company. The answers to the original bill put in issue its material allegations, and answers were filed to the cross-bills, putting in issue their material allegations. By agreement of parties, the bill by Stephen A. and Robert M. Douglas, against the university, was consolidated with the bill in the present case. The court decreed that the original bills and the cross-bill of Stephen A. Douglas be dismissed, and that the prayer in the cross-bill of the insurance company be granted. Errors are assigned upon the several rulings of the court involved in the decree.

Mr. W. P. BLACK, and Mr. HENRY DECKER, for the appellants.

Messrs. SWETT, GROSSCUP & WEAN, and Mr. J. L. HIGH, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The agreement between Douglas and Burroughs of the 10th of November, 1856, was intended by them as a change and amendment of their agreement of the 2d of April, 1856. Their agreement of the last named date was to remain in full force, except as changed and amended by their agreement of the

first named date.    They must therefore be read as if what is changed by the November agreement were stricken out of the April agreement, and the matters of the November agreement were substituted.    So reading it, the latter clause of the agreement must stand as follows: "And then, on the completion of the building as aforesaid, the said party of the first part agrees, for himself, his heirs, administrators, executors and assigns, that he will execute and deliver to the board of trustees aforesaid, or their successors in office, a good and sufficient deed of conveyance, assuring to said board of trustees, or their successors in office, the title of the premises above described, free from incumbrance, for the sole and exclusive use of the university, inalienable for any other use or purpose, forever." The agreement was not intended to be a conveyance, of itself, but simply the evidence of an obligation assumed by Douglas to convey in the future.    It was wholly executory, and it is proved beyond all controversy that it was never complied with by the university.    There never was a time when the university was entitled to demand, as of right, that Douglas execute any deed.    But if there had been full performance of the agreement by the university, Douglas might, of his own voluntary munificence, do more than comply with his contract, and give the university an absolute instead of a qualified title.    The university could not object, for it might as effectually then retain the property for a particular use as if compelled thereto by the terms of the deed, and no one but the university and Douglas had any interest in the question.    It follows, then, that on the 30th of August, 1858, Douglas might make a deed restricted and qualified as by the November, 1856, contract; or he might if he chose to do so, make an absolute deed to the university. No one had a right to object to either.    He made an absolute deed.    There was neither fraud, accident nor mistake affecting his action, and there is no pretense that he did not thoroughly comprehend the legal effect of what he did.    In his deed he recites that he "has granted, bargained and sold," and does

thereby "grant, bargain, sell and convey (the premises described) to the 'board of trustees of the university of Chicago,' and to their successors and assigns,  *  *  *  together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the said party of the first part, either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances, to have and to hold the said premises above bargained and described, with the appurtenances, unto the said party of the second part, their successors and assigns, forever." Then follow covenants of seizin, of good right to convey, and against incumbrances, "with the said party of the second part, their successors and assigns." These are not mere idle words. They were deliberately used, and their legal effect is to convey as absolute and unqualified a title as it was possible for Douglas to convey to the university. This is the only conveyance made by Douglas to the university. The university could not have insisted it is to be read as being qualified by the previous agreement between Douglas and the university, because, not having performed its part of that agreement, the university could claim no rights under it; and the deed being a voluntary grant by Douglas, contained its own limitations, and therefore the university, in accepting it, accepted it as it was.

But for the purpose of argument let it be assumed that this deed was made because of the obligation of Douglas under the agreement between himself and Burroughs; is it not clear that the deed is a satisfaction of his liability under the agreement, and conclusive as to the absolute character of the title held by the university? It can not be said here, as it was said in *Morris* v. *Whitcher*, 20 N. Y. 41, cited by counsel for appellants, that the covenant to convey the title designated in the agreement is collateral, and therefore not satisfied by the deed,

8—127 Ill.

for there is no other covenant in the agreement to which it is possible that it can be collateral. It is itself the principal covenant. By it alone is it pretended that Douglas was at any time under obligation to convey the property to the university. It is impossible that the university can at the same time have an absolute and yet only a restricted or conditional title to this property, and therefore either the prior agreement must control and modify the subsequent deed, or the subsequent deed must satisfy and discharge the prior agreement. It is not questioned by us that Douglas might have made the language of the agreement describe the title conveyed by the deed, either by making an express reference to it for that purpose in the deed, or by exacting from the university, before the rights of third parties had intervened, the execution and delivery of a deed to him declaring that the title conveyed by his deed was accepted and held by the university on the terms stated in the agreement. But he did not do so. Nor did he, as would have been most natural had he so intended, use any language in the deed limiting or qualifying the title conveyed. The general rule is, that a written agreement for the execution of a deed is merged in the deed. *Moser* v. *Miller*, 7 Watts, 156; *Harris* v. *Barker*, 3 Johns. 506; *Houghtailing* v. *Lewis*, 10 id. 296; *Brooks* v. *Mallbie*, 4 Stewart & Porter, 96.

There is nothing in the evidence in this record to make this case exceptional. Upon the contrary, the fact that immediately after the execution of the deed by Douglas the trustees put a loan of $25,000 on the market, and secured it by a deed of trust on the property it conveyed, which was executed by Douglas himself as president of the board of trustees, is conclusive that all parties then thought the character of the title of the university was fixed by the terms of the deed alone. It may be conceded that the evidence very clearly shows that it was desired by Douglas, and by the other members of the board of trustees, that this property should not pass from the university; that the munificence of Douglas in making the grant

was highly appreciated by the trustees, and that they were, in return, anxious that the university should become an honor to his memory.    But this has no tendency to prove that language in a deed is not to be construed according to its well established meaning, or that a prior written agreement, not referred to in that deed or in any written instrument made contemporaneous with or subsequent to its execution, is to be held as qualifying and changing the title it conveys.  The fair inference is, that Douglas trusted entirely to the trustees of the university to see that his wishes and expectations in this regard were not disappointed.  And this does not rest in inference alone.  There is positive proof to that effect.  Burroughs testified, among other things :  "I conversed with Douglas concerning the conveyance.  I told him I thought he had done a very wrong thing.   I told him there was a contract between him and me, and this deed was in anticipation of that contract, and in violation, and my impression was it was fatal to the enterprise.  A concern beginning to go in debt at that stage would be ruined.  And Mr. Douglas said a good deal, trying to smooth me down, saying the better way was to make no fuss about it, but let it go on; that he had confidence in the trustees; that it was a temporary expedient, and they could go on.  So I was induced to keep quiet and let the thing go on."    And the resolution of the board of trustees authorizing the executive committee of the board to execute a bond to Douglas for the faithful "carrying out of the university enterprise according to the spirit of the original contract," is proof to the same effect.  If the grant was on a condition subsequent, then no bond was needed, for the property could not be alienated.  The resolution necessarily implies that the grant was absolute, and that Douglas, therefore, had no guaranty that the property would not be diverted from the purpose of the grant.

The eighth section of the charter of the university has been cited as prohibiting the alienation of this property.   It pro-

vides that "no gifts, grants or devises made to the university for a particular purpose, shall be applied to any other purpose," etc.    But even under the contention of appellants this was not a grant to the university for a *particular purpose.*  The contract of November, 1856, was only that the title should remain in the university "for the purpose expressed in said agreement."  There is no *"particular* purpose expressed in said agreement."    The section, obviously, has reference only to donations to the university to aid in the accomplishment of a special object, as distinguished from aid to the university generally,—as, for instance, to endow a professorship in a particular branch of literature or science, purchase a library or designated scientific instruments, etc.    But if the evidence here showed a grant upon a condition subsequent, the present bills could not be maintained, for no rule is better settled than that a court of equity will not lend its aid to enforce a forfeiture because of a breach of a condition subsequent in a deed. 2 Story's Eq. Jur. sec. 1319; 4 Kent's Com. (8th ed.) 134, *130; Freeman's notes to *Cross* v. *Carson,* 44 Am. Dec, 757. And it will make no difference in such case that the aid of equity is sought upon the special ground of removing a cloud on the title.  *Memphis Railroad Co.* v. *Neighbors,* 51 Miss. 412.

If we are right in the preceding views, it is unnecessary to consider the capacity of the university to make a mortgage, or whether the mortgage foreclosed was executed by the proper parties, for, in that event, those questions do not concern these appellants.    If they have no standing to enforce a forfeiture on account of a breach of a condition subsequent, the decree below is right, since they make no showing that they are entitled to relief on any other ground.

The decree is affirmed.

*Decree affirmed.*

Mr. JUSTICE BAILEY took no part in this decision.